**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**

**DESMOND S. GAINES,**

    **Defendant.**

**Case No. 15-CR-20078-JAR**

**MEMORANDUM AND ORDER**

    This matter comes before the Court on Defendant Desmond Gaines' Motion to Suppress Evidence (Doc. 46). Defendant contends that evidence seized by law enforcement from an encounter on August 24, 2015 was seized in violation of his Fourth Amendment rights. The Government has responded (Doc. 50), and an evidentiary hearing was held on March 8, 2017. The Court has reviewed the evidence and arguments adduced at the hearing and is now prepared to rule. As explained more fully below, Defendant's motion is denied.

**I.    Factual Background**

    Based on the testimony and evidence admitted at the hearing on this motion, the Court finds as follows. On August 24, 2015, Officer Carl Rowland and Officer Shenee Davis, who were both patrol officers with the Kansas City, Kansas Police Department, were dispatched to the Wilhelmina Gill Center, at 645 Nebraska Ave. Kansas City, Kansas, following an anonymous 911 call.[1] The unidentified caller stated there was a "light-skinned" man in all red clothing selling "wet," which is otherwise known as phencyclidine ("PCP"). The caller stated that the man was in the parking lot of the Wilhelmina Gill Center sitting in a white car, but he

---

[1] Gov't Ex. 1.

1

did not know the type of car that the man was driving. The caller stated that he was located at the Wilhelmina Gill Center when he was observing the man.

During his testimony, Officer Rowland testified that he was familiar with the Wilhelmina Gill Center and the surrounding area. Officer Rowland testified that he had responded to several drug-related calls at the Wilhelmina Gill Center. In fact, police dispatch records showed that between March and August 2015, officers had been dispatched to the Wilhelmina Gill Center eight times for reported narcotics sales or for medical calls involving reactions to PCP or other substances.[2] Officer Rowland further testified that based on his experience, he was familiar with the strong, overpowering chemical odor of PCP and with behavior resulting from ingestion of PCP.

Officer Mark Wilcox, a patrol officer for the Kansas City, Kansas Police Department, was working on August 24, 2015 as an off-duty security guard at the Frank Williams Outreach Center, which is directly across the street from the Wilhelmina Gill Center. Officer Wilcox testified that he wears his uniform at the Frank Williams Outreach Center, including his police radio. Prior to the call being dispatched, Officer Wilcox was patrolling the parking lot of the Frank Williams Outreach Center. He noticed a man in all red clothing wiping down his car, a white Cadillac, in the Wilhelmina Gill Center parking lot. Not long after this observation, Officer Wilcox heard the dispatched call that a man wearing all red was selling drugs. As Officer Rowland and Officer Davis arrived on scene, Officer Wilcox radioed about his observation of the man wearing all red entering the white Cadillac. Officer Wilcox did not at any time observe this man conducting a drug transaction.

---

[2] Gov't Ex. 7. On July 24, 2015, police records show that officers were dispatched to the Wilhelmina Gill Center for a female suspected of reacting to ingestion of PCP. *See id.*

Officer Rowland, who was uniformed and driving a marked police cruiser, pulled into the Wilhelmina Gill Center parking lot from the west.³ Officer Davis, who was also uniformed, followed directly behind him in the marked police cruiser that she was driving. Officer Rowland also observed the man (subsequently identified as Desmond Gaines, the "Defendant") entering the white Cadillac and observed that Defendant matched the description of light skinned and wearing all red (red hat, red shirt, red pants, and red shoes). Officer Rowland pulled up behind the driver side of the white car, and Officer Davis pulled up alongside Officer Rowland's cruiser, also to the rear of the white car. Both officers activated the emergency lights on their cruisers because their vehicles were both blocking a lane of traffic in the parking lot. While the two police cruisers blocked the white car from the rear, the white car was not blocked in the front or on the right side and Defendant, who was the driver, could have drove forward without obstacle.

As Officer Rowland approached the driver side of the white car, Defendant, who was sitting in the driver's seat with the door closed, exited the white car and quickly closed the door behind him. Meanwhile, Officer Davis exited her cruiser and approached the rear of the white car. Officer Rowland began to speak to Defendant, who asked Officer Rowland what he was doing; Officer Rowland replied that there was a 911 call about a man matching his description selling drugs. Defendant denied that he was engaged in drug sales.

Officer Rowland asked Defendant for identification; Defendant responded that his identification was in the car trunk.⁴ At this point, Defendant reopened the driver side door and pulled the trunk release. As Defendant began to walk toward the trunk, he began to close the driver side door behind him, but Defendant then caught the door with his hand and the door

---

³ There is both audio and video of the encounter captured on Officer Rowland's police cruiser camera system. Gov't Ex. 3. There is also video from the Wilhelmina Gill Center cameras in the parking lot. Gov't Ex. 2.

⁴ Officer Rowland testified that Defendant was not considered in custody when he asked him for his identification.

3

remained open.  Defendant positioned himself between the car and the open driver side door. Meanwhile, Officer Davis began to walk toward the rear part of the car, and then to the passenger side.

Officer Rowland testified that as soon as Defendant reopened the driver's side door, Rowland smelled a strong chemical odor that based on his training and experience he believed was the odor of PCP.  Officer Rowland further testified that once the trunk was ajar, the odor of PCP became stronger.  From his position next to the driver side door, Officer Rowland also observed a bottle of alcohol on the center console underneath a walkie talkie radio.  Officer Rowland told Defendant that he was going to detain him for having an open container of alcohol within his reach in the car.[5]  Photographs taken at the time of the stop depict a bottle of alcohol on the center console with the lid intact on the bottle.  Officer Rowland testified that although he also decided to detain Defendant in part because of the strong odor of PCP, he did not tell Defendant this at that time, because he did not want to tip Defendant off that he suspected PCP was present.

Once Officer Rowland displayed his handcuffs, he observed Defendant becoming agitated and fidgety.   Officer Rowland reached for Defendant's left hand to place him in handcuffs.  Defendant pulled away from Officer Rowland and reached into the car through the open driver side door.  Defendant removed the keys from the ignition, grabbed a black zippered pouch from the driver side floorboard area, turned and shoved Officer Rowland, and fled on foot. Officers Rowland and Davis chased Defendant on foot.

Defendant fled towards the intersection of Sixth Street and State Street, then ran down an alley between a parking lot and building south of the Wilhelmina Gill Center.  When his path of

---

[5] Possession of alcohol in a vehicle is a violation of K.S.A. § 8-1599, which is an arrestable offense.

flight was obstructed by a fence, Defendant stopped running and threw the black zippered pouch onto the roof of the building located at 612 State Avenue. Officer Rowland observed Defendant throw the zippered pouch on to the building. Officer Rowland testified that Defendant then turned around in an aggressive stance. Officer Rowland drew his firearm because he was unsure if Defendant was armed. Officer Davis was behind Officer Rowland providing cover. After Officer Rowland commanded Defendant to get on the ground, Defendant complied, but as Officer Rowland holstered his firearm and attempted to handcuff him, Defendant resisted. Officer Davis then deployed her Taser for three cycles at which point Defendant was placed in handcuffs.

Meanwhile, while Officer Rowland and Officer Davis chased Defendant on foot, Officer Wilcox, who had watched the encounter, walked from the Frank Williams Outreach Center to Defendant's unattended car in the Wilhelmina Gill Center parking lot. The driver side door and the trunk were both still open when Officer Wilcox approached. As he stood outside the car, Officer Wilcox could see inside the car through the open driver side door. Officer Wilcox observed a handgun on the floorboard of the car, a fact that Officer Wilcox relayed to other officers via radio.

Meanwhile, Officer Rowland obtained a ladder and climbed on top of the building at 612 State Ave. There he recovered the black zipper pouch and its contents: a clear container of PCP, fourteen bags of marijuana, sixty-five bags of crack cocaine, one package of More brand cigarettes,[6] and $641.51 in currency. Inside the car, police recovered a large amount of crack cocaine and some powder cocaine from the center console. Police also recovered the firearm

---

[6] Officer Rowland testified that based on his knowledge and experience as a patrol officer, More brand cigarettes are the cigarette of choice for dipping PCP and smoking it through the cigarette.

visible on the floorboard of the driver seat, as well as three walkie talkie radios, and a cellular telephone.

Following Defendant's arrest, Officer Rowland learned that Defendant had an outstanding warrant for his arrest. Officer Rowland testified that under normal practice when he takes someone's identification, he immediately runs a records check for outstanding warrants. But, given Defendant's flight, Officer Rowland was not able to immediately run a records check. Officer Rowland testified that if Defendant had not fled, he would have run a records check and presumably found the outstanding arrest warrant.

## II.     Discussion

Defendant argues that the evidence seized from the car and from the roof of 612 State Ave. was illegally seized in violation of the Fourth Amendment and should be suppressed. More specifically, Defendant argues the anonymous 911 call did not justify the officers' investigative stop, and that there was no intervening circumstance that purged the taint of the Fourth Amendment violation.

The Court disagrees. This was an initially a consensual encounter for the officers did not detain Defendant, who was in or near his car and who had the ability to leave. The encounter quickly evolved into an investigatory detention, based on the officer's reasonable suspicion of an open container violation and reasonable suspicion that there was PCP present in the car. The investigatory detention was quickly interrupted by Defendant's flight and attempted discard of the zippered pouch, which provided further justification for an investigatory detention. But, even if the initial encounter was an investigatory stop not based upon reasonable suspicion, the attenuation doctrine applies because Officer Rowland would have found Defendant's outstanding arrest warrant upon running Defendant's identification through the system.

**A.    Consensual Encounter**

The Fourth Amendment prohibits unreasonable seizures by law enforcement officers.[7] However, the Fourth Amendment "does not proscribe all contact between the police and citizens."[8] Thus, the Fourth Amendment is not violated when law enforcement officers "merely approach[] an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen."[9] These are properly considered consensual encounters for which the Fourth Amendment is not implicated.[10]

To determine whether a police-citizen encounter is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[11] This test allows officers to engage in consensual encounters "so long as they don't throw their official weight around unduly."[12] This test does not have per se rules, but rather turns on the totality of the circumstances.[13]

The Tenth Circuit has enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with police:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether

---

[7] U.S. Const. amend. IV.  The Fourth Amendment applies to the states through incorporation of the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643 (1961).

[8] *INS v. Delgado*, 466 U.S. 210, 215 (1984).

[9] *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)).

[10] *See United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006).

[11] *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

[12] *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990).

[13] *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994)).

> the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.[14]

The Tenth Circuit has also considered "when police officers pursue a citizen in their squad car while the citizen is on foot, courts will consider whether the officers activated their siren or flashers, operated their car in an aggressive manner to block the citizen's course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt."[15] These factors are not dispositive, but the Tenth Circuit has cautioned that "the strong presence of two or three factors may be sufficient to support the conclusion" that the encounter was not consensual.[16] The nature of a police-citizen encounter can change and what was initially a consensual encounter "may change to an investigative detention if the police conduct changes and vice versa."[17]

When the officers first approached Defendant, it was a consensual encounter. Although their emergency lights were activated and their cruisers blocked Defendant's car from behind, Defendant's car was not blocked from the front or on the right side. And although the emergency lights were activated, the sirens were not activated; in fact, both officers testified they only activated the lights because they had stopped their cruisers in a lane of traffic in the parking lot. The officers did not touch or physically restrain Defendant. They did not have custody of any of Defendant's property or personal effects. The encounter was in a public parking lot where others were present and able to witness the encounter. Although the officers were in

---

[14] *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (citing *Lopez*, 443 F.3d at 1284).

[15] *Id.* (citing *Chesternut*, 485 U.S. at 575)

[16] *Id.* (citing *Lopez*, 443 F.3d at 1284–85) (internal quotations omitted).

[17] *United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012) (quoting *United States v. Zapata*, 997 F.2d 751, 756 n.3 (10th Cir. 1993)). Investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity. *Id.*

uniform and marked police cruisers, the officers did not display their weapons and there is no evidence that they interacted with any indicia of coercive behavior. Officer Rowland spoke in a conversational tone, simply asking to see Defendant's identification, which Defendant agreed to provide. Based on Officer Rowland's conversational tone and Defendant's behavior, the Court finds that this was a consensual encounter. Although the officers did not advise Defendant that this was a mere consensual encounter that Defendant could terminate, they had scant chance to tell Defendant that, in light to the rapid succession of events described below.

As Defendant was in the process of retrieving his identification, he reopened his car door, left the car door open and opened his trunk, which allowed Officer Rowland to detect the strong chemical odor of PCP emanating from the passenger compartment and trunk of Defendant's car. And, when Defendant opened his car door, Officer Rowland observed a bottle of alcohol on the center console, providing him with reasonable suspicion that there was an open container violation. The Court finds that this was initially a consensual encounter that evolved into an investigatory detention upon Officer Rowland's reasonable suspicion based on his plain view observation of an open container in the car and his detection of the strong odor of PCP emanating from the car. Indeed, Officer Rowland told Defendant at that point that he was detaining him for investigation of an open container violation, and Officer Rowland attempted to place Defendant in handcuffs.

The rapidly developing events thereafter provided even more basis for reasonable suspicion, and ultimately probable cause, to arrest Defendant. Defendant grabbed a zippered pouch, shoved Officer Rowland out of the way, and fled on foot, discarding the pouch by throwing it on a rooftop before officers could apprehend him. In fact, just thirty to sixty seconds elapsed between Officer Rowland's initial contact with Defendant and Defendant's flight. The

9

brief consensual encounter and brief investigatory detention almost immediately evolved into a foot chase in which the officers observed Defendant discarding a pouch that Defendant evidently felt compelled to grab before fleeing from the officers.  Once Defendant fled on foot with the black zippered pouch, the officers had probable cause for an arrest.  Thus, there was no violation of the Fourth Amendment as this was initially a consensual encounter, which did not implicate the Fourth Amendment, and later became an investigatory stop, which was supported by reasonable suspicion, or arrest, which was supported by probable cause, based on the open container violation and presence of PCP.

**B.      Attenuation Doctrine**

The attenuation doctrine evaluates the causal link between the government's unlawful act and the evidence seized.[18]  In *Utah v. Strieff*, the Supreme Court considered whether the discovery of a valid existing warrant is sufficient to break the causal chain between an unlawful stop and the discovery of evidence.[19]  The Court looked to the three factors espoused in *Brown v. Illinois* for determining whether the attenuation doctrine applied—

> (1) the court looks to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search; (2) the court considers the presence of intervening circumstances; and (3) the court examines the purpose and flagrancy of the official misconduct.[20]

The Supreme Court held in *Strieff*, a circumstance similar to this case, that "the evidence discovered on Strieff's person was admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant."[21]

---

[18] *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

[19] *Id.*

[20] *Id.* at 2062 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

[21] *Id.* at 2063.

The first factor, the temporal proximity between the unconstitutional conduct and the discovery of evidence, favors suppression of the evidence. The Supreme Court has cautioned that this factor only favors attenuation if a substantial time has elapsed between the conduct and the discovery of evidence.[22] Here, if this Court were to assume the stop itself was unlawful, there were only several minutes between the initial stop and the evidence being found on the roof and in the car. Thus, this would favor suppression.

By contrast, the second factor, the presence of intervening circumstances, strongly favors the Government. In *Strieff*, the Court relied on the fact that the defendant had a valid warrant pre-existing the investigation that was wholly unconnected to the initial stop.[23] "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions."[24] Here, this is somewhat different than the case in *Strieff* because Officer Rowland and Officer Davis did not find out about the outstanding warrant until after Defendant fled on foot and was arrested. However, if Defendant had not fled the initial stop, Officer Rowland would have used Defendant's identification and ran a check. This check would have shown the existence of a valid, pre-existing warrant that was wholly unrelated to the current stop. This would have been an independent, intervening circumstance that would have warranted search of Defendant's person and his car incident to his arrest.[25] This factor strongly favors the Government.

---

[22] *Kaupp v. Texas*, 538 U.S. 626, 633 (2003).

[23] *Strieff*, 136 S. Ct. at 2082.

[24] *United States v. Leon*, 468 U.S. 897, 920 n.21(1984).

[25] *See generally Arizona v. Gant*, 556 U.S. 332, 339 (2009) (explaining the permissible scope of searches incident to arrest).

The third factor, deterring police misconduct, also weighs in favor of the Government. The exclusionary rule exists to deter police misconduct.[26] Here, as this Court described above, Officer Rowland and Officer Davis engaged in a consensual encounter with Defendant. Thus, the Court does not believe that the officers committed any sort of police misconduct. However, even assuming the Court adopted Defendant's argument that this was not a consensual encounter and rose to the level of an investigatory stop without requisite reasonable suspicion, Officer Rowland and Officer Davis could be considered at most negligent. Because there has been no evidence presented that the stop was part of any systemic or willful police misconduct, the Court finds that this factor also strongly favors the Government. In conclusion, the Court finds, based on the three attenuation doctrine factors and the Court's holding in *Strieff*, that the evidence found on the roof and in Defendant's car is admissible because even if the stop was unlawful, it was sufficiently attenuated by the pre-existing arrest warrant.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress Evidence (Doc. 46) is **denied**.

**IT IS SO ORDERED.**

Dated: April 7, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[26] *Davis v. United States*, 564 U.S. 229, 236–237 (2011).