# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DESMOND S. GAINES,

    Defendant.

Case No. 15-CR-20078-JAR

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Desmond Gaines' Motion to Suppress Evidence (Doc. 46). Defendant contends that evidence seized by law enforcement from an encounter on August 24, 2015 was seized in violation of his Fourth Amendment rights. This Court previously denied Defendant's motion on the grounds that Defendant's encounter with law enforcement was consensual.[1] The Tenth Circuit reversed, finding that Defendant was seized, and remanded to this Court to decide whether this seizure was based on reasonable suspicion.[2] The Government has filed a Memorandum of Law,[3] and Defendant has responded.[4] For the reasons discussed below, the Court finds that the officers had reasonable suspicion to seize Defendant, and Defendant's Motion to Suppress (Doc. 46) is **denied**.

### I. Factual Background

These findings are based on the testimony and evidence admitted at the hearing before this Court on March 8, 2017 and the subsequent findings of the Tenth Circuit Court of Appeals

---

[1] Doc. 53.

[2] Doc. 155.

[3] Doc. 159.

[4] Doc. 160.

in *United States v. Gaines*.[5]

On August 24, 2015, Officer Carl Rowland and Officer Shenee Davis, who were both patrol officers with the Kansas City, Kansas Police Department, were dispatched to the Wilhelmina Gill Center, at 645 Nebraska Ave. Kansas City, Kansas, following an anonymous 911 call.[6] The unidentified caller stated there was a "light-skinned" man in all red clothing "selling wet," which is otherwise known as phencyclidine ("PCP"), and that "[the man] just made about twenty dollars." The caller stated that the man was in the parking lot of the Wilhelmina Gill Center sitting in a white car, but he did not know the type of car that the man was driving. The caller stated that the caller was located at the Wilhelmina Gill Center when he observed the man.

At the hearing, Officer Rowland testified that he was familiar with the Wilhelmina Gill Center and the surrounding area. Officer Rowland testified that he had personally responded to several drug-related calls at the Wilhelmina Gill Center, and leading up to the arrest on August 24, "we had an increased contact with individuals under the influence of PCP" around the Wilhelmina Gill Center.[7] In fact, police dispatch records showed that between March and August 2015, officers had been dispatched to the Wilhelmina Gill Center eight times for individuals exhibiting reactions to PCP or other substances.[8] Officer Davis similarly testified that, "we had a lot of medical-type calls of individuals on PCP, along with complaints of narcotics sales in the area."[9]

---

[5] 918 F.3d 793 (10th Cir. 2019).

[6] Gov't Ex. 1.

[7] Doc. 57 at 6:23–25.

[8] Gov't Ex. 7. On July 24, 2015, police records show that officers were dispatched to the Wilhelmina Gill Center for a female suspected of reacting to ingestion of PCP. *See id.*

[9] Doc. 57 at 46:15–22.

Officer Mark Wilcox, a patrol officer for the Kansas City, Kansas Police Department, was working on August 24, 2015 as an off-duty security guard at the Frank Williams Outreach Center, which is directly across the street from the Wilhelmina Gill Center. Officer Wilcox testified that he wears his police uniform at the Frank Williams Outreach Center, including his police radio. Prior to the call being dispatched, Officer Wilcox was patrolling the parking lot of the Frank Williams Outreach Center. He noticed a man in all red clothing wiping down a white Cadillac in the Wilhelmina Gill Center parking lot. Not long after this observation, Officer Wilcox heard the dispatched call that a man wearing all red was selling drugs. As Officer Rowland and Officer Davis arrived on scene, Officer Wilcox radioed about his observation of the man wearing all red entering the white Cadillac. Officer Wilcox, however, never observed this man conducting a drug transaction.

Officer Rowland, who was uniformed and driving a marked police cruiser, pulled into the Wilhelmina Gill Center parking lot from the west.[10] Officer Davis, who was also uniformed, followed directly behind him in the marked police cruiser that she was driving. Officer Rowland also observed the man (subsequently identified as Desmond Gaines, the "Defendant") entering the white Cadillac and observed that Defendant matched the description of light skinned and wearing all red (red hat, red shirt, red pants, and red shoes). Officer Rowland pulled up behind the driver's side of the white Cadillac, and Officer Davis pulled up alongside Officer Rowland's cruiser, also to the rear of the white Cadillac. Both officers activated the emergency lights on their cruisers.

---

[10] There is both audio and video of the encounter captured on Officer Rowland's police cruiser camera system. Gov't Ex. 3. There is also video from the Wilhelmina Gill Center cameras in the parking lot. Gov't Ex. 2.

Officer Rowland approached the driver's side of the white Cadillac and gestured for Defendant to exit the vehicle. A close review of the video reveals that Defendant, who was sitting in the driver's seat with the door closed, began to exit the white Cadillac prior to Officer Rowland's gesture. Regardless, Defendant exited the car and quickly closed the door behind him. Meanwhile, Officer Davis exited her cruiser and approached the rear of the white Cadillac. Officer Rowland began to speak to Defendant, who asked Officer Rowland what he was doing; Officer Rowland replied that there was a 911 call about a man matching his description selling drugs. Defendant denied that he was engaged in drug sales.

Officer Rowland asked Defendant for identification; Defendant responded that his identification was in the car trunk. At this point, Defendant reopened the driver's side door and pulled the trunk release. As Defendant began to walk toward the trunk, he began to close the driver's side door behind him, but Defendant then caught the door with his hand and the door remained open. Defendant positioned himself between the car and the open driver's side door. Meanwhile, Officer Davis began to walk toward the rear part of the car, and then to the passenger side.

Officer Rowland testified that as soon as Defendant reopened the driver's side door, Rowland smelled a strong chemical odor that based on his training and experience he believed was the odor of PCP. Officer Rowland further testified that once the trunk was ajar, the odor of PCP became stronger. From his position next to the driver's side door, Officer Rowland also observed a bottle of alcohol on the center console underneath a walkie talkie radio. Officer Rowland told Defendant that he was going to detain him for having an open container of alcohol within his reach in the car.[11] Photographs taken at the time of the stop depict a bottle of alcohol

---

[11] Possession of alcohol in a vehicle is a violation of K.S.A. § 8-1599, which is an arrestable offense.

on the center console with the lid intact on the bottle. Officer Rowland testified that although he also decided to detain Defendant in part because of the strong odor of PCP, he did not tell Defendant this at that time, because he did not want to tip Defendant off that he suspected PCP was present.

Once Officer Rowland displayed his handcuffs, he observed Defendant becoming agitated and fidgety. Officer Rowland reached for Defendant's left hand to place him in handcuffs. Defendant pulled away from Officer Rowland and reached into the car through the open driver's side door. Defendant removed the keys from the ignition, grabbed a black zippered pouch from the driver's side floorboard area, turned and shoved Officer Rowland, and fled on foot. Officers Rowland and Davis chased Defendant on foot.

Defendant fled towards the intersection of Sixth Street and State Street, then ran down an alley between a parking lot and building south of the Wilhelmina Gill Center. When his path of flight was obstructed by a fence, Defendant stopped running and threw the black zippered pouch onto the roof of the building located at 612 State Avenue. Officer Rowland observed Defendant throw the zippered pouch on to the building. Officer Rowland testified that Defendant then turned around in an aggressive stance. Officer Rowland drew his firearm because he was unsure if Defendant was armed. Officer Davis was behind Officer Rowland providing cover. After Officer Rowland commanded Defendant to get on the ground, Defendant complied, but as Officer Rowland holstered his firearm and attempted to handcuff him, Defendant resisted. Officer Davis then deployed her taser for three cycles at which point Defendant was placed in handcuffs.

Meanwhile, while Officer Rowland and Officer Davis chased Defendant on foot, Officer Wilcox, who had watched the encounter, walked from the Frank Williams Outreach Center to

Defendant's unattended car in the Wilhelmina Gill Center parking lot. The driver's side door and the trunk were both still open when Officer Wilcox approached. As he stood outside the car, Officer Wilcox could see inside the car through the open driver's side door. Officer Wilcox observed a handgun on the floorboard of the car, a fact that Officer Wilcox relayed to other officers via radio.

Meanwhile, Officer Rowland obtained a ladder and climbed on top of the building at 612 State Ave. There he recovered the black zipper pouch and its contents: a clear container of PCP, fourteen bags of marijuana, sixty-five bags of crack cocaine, one package of More brand cigarettes,[12] and $641.51 in currency. Inside the car, police recovered a large amount of crack cocaine and some powder cocaine from the center console. Police also recovered the firearm visible on the floorboard of the driver's seat, as well as three walkie talkie radios, and a cellular telephone.

## II. Standard

The Supreme Court has defined "reasonable suspicion" as a "particularized and objective basis" for believing the person being stopped is committing or did commit a violation.[13] "The Fourth Amendment permits brief investigative stops when law enforcement officers have 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[14] Whether officers have reasonable suspicion depends "upon both the content of information possessed by police and its degree of reliability."[15]

---

[12] Officer Rowland testified that based on his knowledge and experience as a patrol officer, More brand cigarettes are the cigarette of choice for dipping PCP and smoking it through the cigarette.

[13] *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[14] *Id.*

[15] *Alabama v. White*, 496 U.S. 325, 330 (1990).

Reasonable suspicion is a less demanding standard than probable cause.[16] Further, in making reasonable-suspicion determinations, courts must look at the "totality of the circumstances" of each case to decide whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.[17]

**III.    Discussion**

The Court begins its analysis with the Tenth Circuit's conclusion that Defendant was seized when officers approached his car while flashing their emergency lights and told Defendant that they had come because of a report he was selling drugs.[18] Based on this timeline, the Court must consider whether the officers had reasonable suspicion to approach Defendant in the first place.

The majority opinion noted that this issue is "close."[19] In doing so, the Court pointed to two potentially material factual disputes: (1) whether the 911 caller implied that he had observed a drug sale; and (2) whether either police officer had known of past drug sales in the area where Defendant was located.[20] Answering both questions in the affirmative and considering Supreme Court precedent with regard to anonymous tips, the Court concludes that the officers had reasonable suspicion to seize Defendant.

**A.    911 Call**

The Supreme Court has noted that "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity."[21] Nevertheless, the Court has found that "under

---

[16] *Id.*

[17] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[18] *United States v. Gaines*, 918 F.3d 793, 803 (10th Cir. 2019).

[19] *Id.* at 801.

[20] *Id.* at 802.

[21] *Navarette v. California*, 572 U.S. 393, 397 (2014) (emphasis in original).

7

appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop,'"[22] Certainly, not all anonymous tips contain sufficiently indicia of reliability.[23] In *J.L.*, police received an anonymous phone call from "an unknown location by an unknown caller" alerting the police that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."[24] The Court noted that there was no audio recording, nothing was known about the informant, and that the call lacked "indicia of reliability" because the call provided no predictive information for the police to test the informant's knowledge or credibility.[25] The Court held that under these circumstances the officers lacked reasonable suspicion to frisk the defendant for weapons.[26]

Conversely, in *Navarette v. California*, the Supreme Court found that an anonymous 911 call was sufficiently reliability to provide reasonable suspicion for a traffic stop. In *Navarrete*, the Supreme Court considered three primary factors in assessing the reliability of an anonymous tip: the caller (1) "claimed eyewitness knowledge of the alleged dangerous driving," (2) "reported the incident soon after she was run off the road," and (3) "use[d] the 911 emergency system."[27] The Court considers these factors in turn.

With regard to the first factor, here, the caller implies that he personally observed Defendant's drug sale. He stated that Defendant was selling wet (PCP) and further that Defendant "just made about twenty dollars." He also provided detailed information about how

---

[22] *Id.* (citing *Alabama v. White*, 496 U.S. 325, 327 (1990)).

[23] *See Florida v. J.L.*, 529 U.S. 266 (2000).

[24] *Id*. at 268, 270.

[25] *Id*.

[26] *Id*. at 270.

[27] *Navarette v. California*, 572 U.S. 393, 399–400 (2014).

Defendant was dressed and where he had parked his car.[28]  Nonetheless, the other two factors are also clearly met here.

The caller made a contemporaneous report of his observations of Defendant's activities, criminal or not.[29]  He states that "[Defendant] *just* made about twenty dollars" and told the 911 operator, "I'm watching him *right now* . . . he's still walking up the hill."[30]  "Substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation."[31]  While Defendant asserts that the lack of criminal activity being described contemporaneously negates this factor, the Court finds that the overall reliability of the tip is increased by the caller's report of present sense impressions, which "weigh[s] in favor of the *caller's* veracity."[32]  This factor distinguishes the present case from *J.L.*, where the caller did not imply that he had personally witnessed any activity, criminal or not, contemporaneously.

Further, the caller reported the tip through the 911 system.  In *Navarette*, the Supreme Court noted that "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity," including providing victims of false tips "with an opportunity to identify the false tipster's voice."[33]  Defendant argues that this factor is irrelevant because the Government has offered no evidence that the call was traced or traceable.  The call was, however, clearly recorded.  If the tip had been false,

---

[28] *See United States v. Williams*, 646 F. App'x 624, 627 (10th Cir. 2016) (finding one factor to consider in assessing the reliability of a 911 call is "whether the informant provided detailed information about the events observed").

[29] *See id.* (finding one factor to consider in assessing the reliability of a 911 call is "whether the informant reported contemporaneous, firsthand knowledge").

[30] Gov't Ex. 1.

[31] *Navarette*, 572 U.S. at 400 (citing Advisory Committee's Notes on Fed. R. Evid. 803(1), which describes "the rationale for the hearsay exception for 'present sense impression[s]'").

[32] *Id*. (emphasis added).

[33] *Id*.

9

Defendant would have had the opportunity to identify the caller's voice. In this regard, the caller "lacked true anonymity."[34]

Additionally, the caller told the operator where he was, he stayed on the phone for over two minutes, and he answered every question that was put to him, including answering the operator honestly that he did not know what type of car Defendant was driving. The Tenth Circuit has noted that "giving the address" is "at least an 'indicium of reliability.'"[35] Moreover, the caller was not intentionally anonymous; the operator simply never asked his name, and there is no reason to believe that he would not have provided it.[36] Similarly, to the extent Defendant argues that the fact the caller did not relay any motive for the call hurts its reliability, the Court finds no basis to infer any animosity or ulterior motive here.[37] While the presence of these factors may serve as another basis to find the tip reliable, their absence is not dispositive.

Finally, the fact that the call was over two minutes long demonstrates that the caller was not in any hurry to make an allegation and then quickly hang up. While Defendant contends that the length of the call "adds nothing to the reliability calculus,"[38] the Court finds the length contributes to the credibility of the tip. While no one factor makes the tip reliable, the Court finds that the aggregate effect of the above factors makes this anonymous tip sufficiently reliable to provide reasonable suspicion.

---

[34] *See Williams*, 646 F. App'x at 627.

[35] *United States v. Madrid*, 713 F.3d 1251, 1260 (10th Cir. 2013).

[36] *See id.* ("[T]he 911 operator never asked the caller for his name or other identifying information and there is no reason to believe he would not have provided this information if requested.")

[37] *See Madrid*, 713 F.3d at 1261 ("This stated motive further buttresses the reliability of the information related by the caller because it reduces the possibility that he harbored animosity towards defendant or his companions and tends to show that he was not using 'the device of a phony tip to wreak injury (indignity, invasion of privacy, suspicion, and sheer annoyance) on [his] enemies, rivals or acquaintances without fear of being held responsible.'").

[38] Doc. 160 at 18.

## B. Additional Factors

Furthermore, the Court need not rely solely on the 911 call here. The responding officers had first-hand knowledge of drug sales and other drug activity in the area. Officer Davis testified that "we had a lot of medical-type calls of individuals on PCP, along with complaints of *narcotics sales* in the area."[39] Officer Rowland testified that he had personally responded to calls for service around the Wilhelmina Gill Center involving narcotics complaints. He also testified that in the time leading up to the arrest on August 24, "we had increased contact with individuals under the influence of PCP."[40] Police records show that between March and August 2015, officers had been called eight times to the area for medical calls involving reactions to PCP or other substances.[41] "[T]he fact that conduct occurs in an area known for criminal activity [is an] appropriate factor[] to consider in determining whether reasonable suspicion exists."[42]

Defendant contends that the officers' knowledge of drug-use in the area does not constitute the "particularized and objective basis for suspecting the particular person stopped of criminal activity."[43] "That the stop occurred in a high-crime area is a relevant consideration but does not permit police to detain an individual without additional, particularized observations."[44] Here, however, the officers' knowledge of drug—including PCP—use and sales in the area was not the sole factor for the stop. Rather, this background knowledge provided a particularized basis for the officers to find the 911 caller's information reliable.

---

[39] Doc. 57 at 46:15–22.

[40] *Id.* at 6:23–25.

[41] Gov't Ex. 7. On July 24, 2015, police records show that officers were dispatched to the Wilhelmina Gill Center for a female suspected of reacting to ingestion of PCP. *See id.*

[42] *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009).

[43] *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[44] *United States v. Pena-Montes*, 589 F.3d 1048, 1055 (10th Cir. 2009)

11

The Officers also knew the *particular person* in the parking lot who the caller accused.[45] Officer Wilcox, who was off-duty across the street, radioed that the man in the white Cadillac had been the man standing on the corner dressed in all red when the tipster called.

While the Tenth Circuit "typically place[s] little weight on uncorroborated anonymous tips,"[46] the Court finds that the totality of the circumstances here bears sufficient indicia of reliability to provide reasonable suspicion. The reliability of the tip—including the caller's statement implying that he had observed Defendant making a drug sale, the contemporaneous nature, the use of the 911 system, the honest answers of the caller, and the length of the call—coupled with the responding officers' particularized knowledge of narcotic sales in the immediate area and Officer Wilcox's observations, "possessed an internal coherence that gave weight to the whole."[47] The officers had reasonable suspicion to conduct a brief investigative stop.

### C. Abandonment

The Fourth Amendment does not prohibit a search of property that has been abandoned.[48] "Property is considered abandoned if the owner lacks an objectively reasonable expectation of privacy."[49] "Abandonment contains subjective and objective components" including whether the individual intended to relinquish any right to the property and whether his "expectation of

---

[45] *Cortez*, 449 U.S. at 417–18.

[46] *United States v. Martinez*, 910 F.3d 1309, 1314 n.2 (10th Cir. 2018)

[47] *United States v. Brown*, 496 F.3d 1070, 1079 (10th Cir. 2007) (citing *United States v. Jenkins,* 313 F.3d 549, 554 (10th Cir. 2002).

[48] *Abel v. United States*, 362 U.S. 217, 241 (1960); *United States v. Juszczyk*, 844 F.3d 1213, 1213 (10th Cir. 2017).

[49] *Juszczyk*, 844 F.3d at 1214

privacy" is "objectively reasonable."[50] "When individuals voluntarily abandon property, they forfeit any expectation of privacy in it they might have had."[51]

Here, Defendant fled from the officers carrying a small black pouch. When he found that he was obstructed by a fence, he stopped running and threw the black pouch onto the roof of the building located at 612 State Avenue. Officer Rowland observed Defendant throw the pouch onto the building. After Defendant was arrested, Officer Rowland obtained a ladder and climbed on top of the building at 612 State Ave to retrieve the pouch.

Defendant was clearly trying to conceal the black pouch from the police. He threw the pouch onto the rooftop at 612 State Avenue after realizing he was going to be arrested, not because he had any privacy interest in that particular building. Moreover, because he knew he was about to be arrested, he could not have intended to return for the pouch. In *Juszczyk*, the Tenth Circuit found that the Defendant "did not retain an objectively reasonable expectation of privacy once he threw the backpack onto [his neighbor's] roof."[52] Here, Defendant threw the pouch onto a random building in Kansas City, Kansas; any expectation of privacy was not objectively reasonable.

As both the Government and Defendant recognize, "[a]bandonment will not be recognized when it is the result of illegal police conduct."[53] Here, however, the Court finds that the officers had reasonable suspicion to perform a brief investigative stop. Accordingly, after

---

[50] *Id.*

[51] *United States v. Trimble*, 986 F.2d 394, 399 (10th Cir. 1993) (quoting *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983)).

[52] *Juszczyk*, 844 F.3d at 1215.

[53] *United States v. Ward*, 961 F.2d 1526, 1535 (10th Cir. 1992), *overruled on other grounds*, *United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994).

Defendant fled, he abandoned the pouch on the rooftop, and no warrant was required to seize or search it.

**IT IS THEREFORE ORDERED BY THE COURT** Defendant's Motion to Suppress (Doc. 46) is **denied**

**IT IS SO ORDERED.**

Dated: August 9, 2019

                                              S/ Julie A. Robinson
                                              JULIE A. ROBINSON
                                              CHIEF UNITED STATES DISTRICT JUDGE